**FILED**

U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

NOV 1 7 2016

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF ARKANSAS

HERBERT TISHER,

      Plaintiff,

v.

      Docket No. 4:16cv846-Sww

WRIGHT MEDICAL GROUP, INC. and
WRIGHT MEDICAL TECHNOLOGY, INC.,

      Defendants.

## COMPLAINT FOR DAMAGES

### PARTIES

1.    At relevant times hereto, Plaintiff, Herbert Tisher, was and is an adult resident and citizen of the State of Delaware, residing in the County of Kent, at 269 Fox Run Drive, Magnolia, Delaware 19962.

2.    Defendant Wright Medical Group, Inc., is a Delaware corporation with its principal place of business at 1023 Cherry Road, Memphis, Tennessee 38117, and as such is a citizen of the State of Delaware and is a citizen of the State of Tennessee.

3.    Defendant Wright Medical Technology, Inc., is a Delaware corporation, with its principal place of business at 1023 Cherry Road, Memphis, Tennessee 38117, and is registered to do business in the State of Tennessee.   Defendant Wright Medical Technology, Inc. is a wholly owned subsidiary of Defendant Wright Medical Group, Inc.

4.    Defendant Wright Medical Technology, Inc., is registered to do business in the state of Arkansas, and at all times relevant hereto did business in the State of Arkansas.

**This case assigned to District Judge** Wright
**and to Magistrate Judge** Volpe

5.     Defendant Wright Medical Technology, Inc., at all times relevant hereto, was engaged in the business of designing, manufacturing, distributing, selling, marketing and/or introducing into interstate commerce, either directly or indirectly through third-parties or related entities, various prosthetic orthopedic products, including the Wright Medical Profemur® Hip products that are in issue in this civil action.

6.     Defendant Wright Medical Group, Inc., at all times relevant hereto, was engaged in the business of designing, manufacturing, importing, distributing, selling, marketing and/or introducing into interstate commerce, either directly or indirectly through third-parties or related entities, various prosthetic orthopedic products, including the Wright Medical Profemur® Hip products that are in issue in this civil action.

7.     Defendant Wright Medical Group, Inc., itself, and as the parent corporation of Defendant Wright Medical Technology, Inc., and Wright Cremascoli, f/k/a/ Cremascoli Ortho Group, was involved in the business of designing, licensing, manufacturing, importing, distributing, selling, marketing, and introducing into commerce within the State of Arkansas, either directly or indirectly through third parties or related entities, numerous orthopedic products, including the Wright Medical Profemur™ Hip System, and the Wright Medical titanium Profemur® Modular Neck, as well as conducting post market surveillance, monitoring and reporting adverse events, and having a role in the decision process and response of the Wright Medical defendants, if any, related to these adverse events.

2

## JURISDICTION & VENUE

8.      At all times relevant hereto, Defendant Wright Medical Group, Inc., was doing business in the State of Arkansas and/or is otherwise subject to the jurisdiction of courts in the State of Arkansas, including this United States Federal District Court.

9.      At all times relevant hereto, Defendant Wright Medical Technology, Inc., was doing business in the State of Arkansas and/or is otherwise subject to the jurisdiction of courts in the State of Arkansas, including this United States Federal District Court.

10.      The injury to the Plaintiff, directly and proximately caused by the Defendants' defective product, occurred in Pulaski County, Arkansas.

11.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (c), as a substantial part of the events giving rise to this claim occurred in Pulaski County in the State of Arkansas.

12.      Defendant Wright Medical Group, Inc., is further subject to the jurisdiction of this Court, and service of process in this federal district, because it was the designer, manufacturer, importer and/or distributor of the product that is the subject of this litigation, with the knowledge and intention that the product would be distributed and used in in the State of Arkansas, and has sufficient minimum contacts with Arkansas such that exercise of jurisdiction over Defendant Wright Medical Group, Inc., in Arkansas would not offend traditional notions of fair play and substantial justice.

13.      This United States Federal District Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of different States, and the

amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

14.     Venue is proper in this United States Federal District Court pursuant to 28 U.S.C. § 1391(a) and (c), as a substantial part of the events giving rise to this claim occurred in the Pulaski County in the State of Arkansas.

### FACTUAL ALLEGATIONS

### PLAINTIFF HERBERT TISHER'S PROFEMUR HIP

15.     On May 31, 2012, Plaintiff Herbert Tisher had a Wright Medical artificial hip implanted in his right hip in a procedure known as a total hip arthroplasty (THA).

16.     C. Lowry Barnes, M.D. was the surgeon who implanted Plaintiff's Wright Medical artificial hip.

17.     Plaintiff's May 31, 2012 hip implant surgery was performed at University of Arkansas Medical Sciences Medical Center in Little Rock, Arkansas.

18.     C. Lowry Barnes, M.D. did not violate any generally accepted standards of care in the field of orthopedic surgery in his care and treatment of Plaintiff in any of the following respects:

(a)     In the care or treatment that he provided to Plaintiff prior to beginning the hip implant surgery;

(b)     In the information that he did or did not provide Plaintiff prior to beginning the hip implant surgery;

(c)     In the selection of the Wright Medical Profemur® CoCr modular neck, or any other Wright Medical artificial hip devices, that were implanted in Plaintiff;

(d)     In the hip implant surgery he performed on Plaintiff;

4

(e)     In the care or treatment that he provided to Plaintiff, subsequent to Plaintiff's hip implant surgery; and,

(f)     In the information that he did or did not provide to Plaintiff subsequent to Plaintiff's hip implant surgery.

19.     Based upon the patient population that the Defendants Wright Medical intended their Profemur® artificial hip devices to be implanted in, at the time of implantation with his Wright Medical Profemur® hip devices, Plaintiff Herbert Tisher was an appropriate patient to be implanted with the Wright Medical Profemur® hip devices he received.

20.     C. Lowry Barnes, M.D. recommended the Wright Medical Profemur® hip devices to Plaintiff and indicated that the Wright Medical Profemur® hip devices were appropriate for him.

21.     Herbert Tisher reasonably relied upon C. Lowry Barnes, M.D. in deciding to proceed with hip replacement surgery and have Wright Medical Profemur® hip devices implanted in him.

22.     "Patient Testimonials" and "Patient Stories" published by Defendants Wright Medical on Wright Medical's internet website promoting Wright Medical's hip products illustrate and demonstrate the patient population, and activity levels, that Wright Medical intended for its Profemur® Dynasty® and Conserve® hip devices.

23.     Before or during the course of the Plaintiff's May 31, 2012 surgery, Defendants, arranged for the specific Wright Profemur® ·Dynasty® and Conserve® hip devices that were implanted in Plaintiff to be delivered to the University of Arkansas Medical Sciences Medical Center and/or Dr. Barnes for implantation in the Plaintiff.

24.     In his total hip replacement surgery on May 31, 2012, Plaintiff Herbert Tisher

had implanted in his right hip the following specific Wright Medical artificial hip devices

among others:

- a.     Profemur® Plus CoCr Modular Neck
        Size: Short/9 VAR/VAL
        Ref: PHAC-1252
        Lot #: 1402713

- b.     Conserve® A-Class® Femoral Head
        Size: 42mm
        Ref: 38AM4200
        Lot: 1418329

- c.     Dynasty® PC Shell
        Size: 58mm
        Ref: DSPC-GG58
        Lot: 1418614

- d.     Cancellous Self-Tapping Bone Screw
        Size: 6.5mm

- e.     Dynasty® A-Class® Poly Liner
        15 Degree
        36mm
        Group D
        Ref: DLXP-LD36
        Lot: 1407914

- f.     Profemur® TL Femoral Stem
        Size: 6

25.     Based upon the patient population that Wright Medical intended their

Profemur® hip devices to be implanted in, and when Plaintiff Herbert Tisher had these

devices implanted in him, he was an appropriate patient to be implanted with these Wright

Medical Profemur®, Dynasty® and Conserve® hip devices.

26.     Subsequent to the date of implantation of his Wright Medical artificial hip, Plaintiff used his Wright Medical artificial hip in a normal and reasonably expected manner.

27.     Subsequent to the date of implantation of his Wright Medical artificial hip, Plaintiff used his Wright Medical artificial hip in a manner consistent with, if not less actively than, many of the representations made in "Patient Testimonials" and "Patient Stories" that appeared in the Wright Medical websites.

28.     After initial recovery from his May 31, 2012 surgery, for a period of time Plaintiff's Wright Medical artificial hip performed as expected, and the pain and disability Plaintiff had experienced in his right hip prior to his May 31, 2012 surgery had been substantially relieved.

29.     On or about the date of November 18, 2014, approximately 29 months after his May 31, 2012 implant surgery, metal ion testing was performed on Plaintiff Herbert Tisher, with results reporting elevated blood chromium levels.

30.     X-rays taken on or about February 29, 2016, revealed loosening of the acetabular component of the Wright Medical artificial hip.

31.     Revision surgery was performed on Plaintiff Herbert Tisher's right hip by Neil P. Sheth, M.D. on April 12, 2016.

32.     Plaintiff Herbert Tisher's revision surgery consisted of an extended trochanteric osteotomy for removal of an otherwise well fixed femoral component.

33.    In the course of the revision surgery performed on April 12, 2016, Neil P. Sheth, M.D., excised the pseudocapsule wherein pathology revealed synovial tissue with marked acute inflammation and granulation tissue and fibrosis.

34.    In the course of the revision surgery performed on April 12, 2016, Neil P. Sheth, M.D. removed all of the Plaintiff's Wright Medical Profemur devices, as well as all other Wright Medical artificial hip devices.

35.    With the exception of the fact that the CoCr Modular Neck of Plaintiffs' artificial hip had corroded at its distal end were it seated in the pocket of the Profemur® Stem, at the time of it's the Plaintiff's revision surgery, each of the devices of the Plaintiff's Profemur® hip was in substantially the same condition in all relevant respects as when they left Defendants' control.

36.    With the exception of the fact that the CoCr Modular Neck of Plaintiff's artificial hip had corroded and caused injury to the Plaintiff, at the time of its revision on April 12, 2016, Plaintiff's Profemur® hip was not otherwise in need of hip revision surgery.

## ACCRUAL OF PLAINTIFF'S CAUSES OF ACTION

37.    Prior to April 12, 2016, Plaintiff had neither knowledge nor notice that there was any defect in the design, manufacture or labeling of his implanted Profemur® Plus CoCr Modular Neck.

38.    Prior to April 12, 2016, Plaintiff had neither knowledge nor notice that he had suffered any injury because of any negligence, actions or inactions, errors or omissions, by Wright Medical.

39.     It was not until April 12, 2016 that Plaintiff first had any notice or knowledge that his injuries and/or that the failure of the Profemur® Plus CoCr Modular Neck implanted in his right hip was the result of any defects in the design, manufacture, warning or labeling of his implanted Profemur® Plus CoCr Modular Neck.

40.     Prior to April 12, 2016, Plaintiff did not know, and could not have known by the exercise of reasonable diligence, that his right hip had been injured by a defect in his Profemur® Plus CoCr Modular Neck.

41.     Prior to April 12, 2016, Plaintiff did not know and could not have known by the exercise of reasonable diligence of any cause of any injury to his right hip was a direct or proximate result of a defect in his Profemur® Plus CoCr Modular Neck.

42.     Prior to April 12, 2016, Plaintiff had no reason to know or suspect that the hip implanted in his right hip was defective or was in the process of failing due to corrosion at the neck stem junction.

43.     Plaintiff's causes of action alleged in this Complaint therefore did not accrue until April 12, 2016.

## WRIGHT MEDICAL GROUP

44.     In approximately the year 1985 a European manufacturer of artificial hip devices known as Cremascoli Ortho Group ("Cremascoli"), which had designed and manufactured artificial hips, developed the first prototype series of the titanium Profemur® Modular Necks.

45.     Profemur® Modular Necks were first patented by Cremascoli, and marketed by it in 1986.

46.    In December 1999, Defendant Wright Medical Group, Inc., acquired Cremascoli Ortho, acquiring its product lines, documents, and manufacturing facilities, including the Profemur® line of hip products.

47.    In the Form 10(k) filed by Defendant Wright Medical Group, Inc., with the United States Securities and Exchange Commission, for the fiscal year ended December 31, 2001, on page 2 of that document, said Defendant states:

> Wright Medical Group, Inc. (the "Company") is a global orthopaedic device company specializing in the design, manufacture and marketing of reconstructive joint devices and bio-orthopaedic materials.

48.    In the Form 10(k) filed by Defendant Wright Medical Group, Inc., with the United States Securities and Exchange Commission for the fiscal year ended December 31, 2001, on page 2 of that document, Wright Medical Group, Inc., states:

> [O]n December 22, 1999, the Company acquired Cremascoli Ortho Group ("Cremascoli"), based in Toulon, France.

49.    In the Form 10(k) filed by Defendant Wright Medical Group, Inc., with the United States Securities and Exchange Commission for the fiscal year ended December 31, 2001, on page 8 of that document Wright Medical Group, Inc., states:

> Through the Company's acquisition of Cremascoli, several hip implant products designed for the European market, including the . . . PROFEMUR-TM-R Hip System, were acquired. . . . The PROFEMUR-TM-R hip stem is a revision replacement implant with a patented modular femoral neck component. . .

50.    After the acquisition of Cremascoli, Wright Medical expanded the Profemur® modular artificial hip stem and modular neck product line to include additional models or versions of Profemur® Stems and Profemur® Modular Necks.

51.     After the acquisition of Cremascoli, Wright Medical branded what is at times referred to by Wright Medical as the Wright Medical Profemur® Total Hip System.

52.     In 2001, a "re-styling" of the Profemur® Modular Necks' mid-body improved the allowed range of motion.

53.     From the time Profemur® Modular Necks were first introduced to the United States, through the date of August 25, 2009, the 2001 "restyled" Profemur® Modular Necks were the only design or style of the modular necks that were distributed or sold in the United States.

54.     Sometime after the date of August 25, 2009, Wright Medical began to offer for distribution and sale in the United States Profemur® Modular Necks made of a cobalt chrome alloy [CoCr].

55.     The Wright Medical Profemur® CoCr Modular Necks were intended to be a cobalt chrome alternative for the 2001 "restyled" Wright Medical titanium Profemur® Modular Necks, compatible with most if not all of the same Wright Medical Profemur® stems and Wright Medical Conserve femoral heads.

56.     In the year 2014, the Wright Medical OrthoRecon operating segment, was sold by Wright Medical Group, Inc., to a foreign entity known as MicroPort Scientific Corporation, for approximately $285 million.

57.     In its form 10-Q, filed with the United States Securities and Exchange Commission, for the quarter ended March 31, 2014, Wright Medical Group, Inc., states:

> On January 9, 2014, pursuant to the previously disclosed Asset Purchase Agreement, dated as of June 18, 2013 (the Purchase Agreement), by and among us, MicroPort Scientific Corporation, a corporation formed under the laws of the Cayman Islands (MicroPort), and MicroPort Medical B.V., a

besloten vennootschap formed under the laws of the Netherlands, we completed our divesture and sale of our business operations operating under the OrthoRecon operating segment (the OrthoRecon Business) to MicroPort.  Pursuant to the terms of the Asset Purchase Agreement, the purchase price (as defined in the Purchase Agreement) for the OrthoRecon Business was approximately $285 million (including an estimated working capital target adjustment), which MicroPort paid in cash.

58.    The sale by Wright Medical Group, Inc., of the OrthoRecon operating segment included the sale to MicroPort of the Wright Medical Profemur® product line and its manufacturing facilities in Arlington, Tennessee.

59.    It appears from its filings with the United States Securities and Exchange Commission that Wright Medical Group, Inc., did not leave with defendant Wright Medical Technology, Inc., the approximately $285 million realized in the sale of its OrthoRecon operating segment, but has publically reported that the $285 million realized in the sale of the OrthoRecon operating segment is an asset (cash) of Wright Medical Group, Inc.

60.    The conduct, claims, and activities, of Wright Medical Group, Inc., and the management and control that Wright Medical Group, Inc. exercised over Wright Medical Technology, Inc., including the sale of its OrthRecon operating segment, and taking and treating the assets of that sale as the assets of Wright Medical Group, make it liable for any and defects in or negligence of Wright Medical Technology, Inc., associated with the design, manufacture, labeling, promotion, distribution, or sale of the Wright Medical CoCr Profemur Modular Necks.

## THE WRIGHT MEDICAL PROFEMUR HIP

61.    Since 1985, Defendant, Wright Medical Technology, Inc., directly or through its parent corporation, subsidiaries or affiliates, Wright Medical Group, Inc., Wright

Medical Europe, S.A., Cremascoli Ortho, Wright Cremascoli Ortho, and others, designed, manufactured, labeled, marketed, promoted, distributed, and sold in the United States the artificial hips with modular components.

62.     Sometime after December 13, 2000, Defendant Wright Medical Technology, Inc. began to manufacture, label, market, promote, distribute and sell in the United States the Wright Medical Profemur® Hip System and its components, including the Profemur® Hip System modular heads, necks and stems.

63.     Between the dates of December 13, 2000 and August 25, 2009 the Profemur® Hip System included neck and stem components made of a titanium alloy, generally known as Ti6Al4V.

64.     In various marketing and promotional material published and distributed by Wright Medical from approximately the year 2002, and into the year 2005, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made the following representations, statements, claims and guarantees about its Profemur modular necks:

> The modular neck system, designed by Cremascoli in 1985 (U.S. Patent #4,957,510), has now been successfully implanted in over 50,000 patients requiring both primary and revision hip arthroplasty.  Extensive laboratory tests have proven that the coupling between the modular neck and femoral implant guarantees:
>
> - Structural reliability
> - Absence of significant micromovement
> - Absence of fretting corrosion

[e.g., Wright Medical Technical Monograph MH688-102 ©2002, and © 2004]

65.     The above quoted statement by Wright Medical that it, "guaranteed . . . absence of fretting corrosion," with its Profemur modular necks was false at the time it was first made.

66.     The above quoted statement by Wright Medical that it, "guaranteed  . . . absence of fretting corrosion," with its Profemur modular necks was false at the time Wright Medical stopped making that statement in its printed publications in the year 2005.

67.     Wright Medical has never corrected or recanted the above quoted statement that it, "guaranteed . . . absence of fretting corrosion," with its Profemur modular necks.

68.     Testing done by Wright Medical prior to the year 2003 proved that fretting corrosion in fact occurred with its Profemur modular necks.

69.     Post market surveillance conducted by Wright Medical from the years 2003 through 2008 proved that fretting corrosion in fact occurred with its Profemur modular necks.

70.     Testing done by Wright Medical in 2008-2009 proved that fretting corrosion in fact occurred with its Profemur modular necks.

71.     In various marketing and promotional material published and distributed by Wright Medical from approximately the year 2002, and into the year 2008, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made the following representations, statements, claims and guarantees about its Profemur modular necks:

> In summary, the clinical effectiveness and dependability of modular necks
> has been consistently demonstrated throughout the clinical history of rights

14

> Profemur® Modular Necks.   Utilized in both primary and revision applications, the current neck design has been successfully employed to improve surgical outcomes with <u>no reported failures</u>.
> [emphasis added]

[See: Stature™ Modular Hip Reconstruction – Design Rationale – Your stem philosophy. Your next choice. Your crop preference. Wright Medical Technology, Inc. publication MH 179-703, Rev 9.08]

72.     By the date of May 1, 2005, if not before that date, Wright Medical knew that the above quoted statement by Wright Medical that, "Utilized in both primary and revision applications, the current [Profemur modular] neck design has been successfully employed to improve surgical outcomes with no reported failures," was false.

73.     Wright Medical has never corrected or recanted the above quoted statement by Wright Medical that "Utilized in both primary and revision applications, the current [Profemur modular] neck design has been successfully employed to improve surgical outcomes with no reported failures,"

74.     After Wright Medical titanium Profemur® Modular Necks began to be implanted, Wright Medical began to receive reports of its Profemur® titanium modular necks having fractured (i.e., broken into two pieces) at the oblong taper distal end where it is seated in the Profemur® stem.

75.     At some point in time prior to July 30, 2010, Wright Medical came to the conclusion that higher than normal rates of early failure of the long offset Profemur® titanium modular necks have been observed for heavyweight (>230 lbs.) patients.

15

76.     As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to grow, case studies appeared in medical journals reporting the fracture of Wright Medical titanium Profemur modular necks.

77.     As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to grow, surgeons who had been implanting these devices began to question the safety of these devices for implantation in certain patients.

78.     As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to grow, surgeons who had been implanting these devices stopped using the Wright Medical titanium modular necks.

79.     As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to grow, Wright Medical's market share of the United States artificial hip implant market began to decline.

80.     As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to grow, at some point Wright Medical began to design and develop a Profemur modular neck made of a cobalt chrome [CoCr] alloy.

81.     To this day Wright Medical does not admit that there was, or is, any defects in the design or manufacture of its titanium Profemur modular necks that leads to premature fracture of the modular necks.

82.     The design, development, and introduction of Wright Medical CoCr Profemur modular necks was not done as a subsequent remedial measure for any design defect in that the Wright Medical titanium Profemur modular necks.

16

83.     One of the purposes of Wright Medical designing and developing a Profemur modular neck made of cobalt chrome was to preserve its market share of the artificial hip device market.

84.     On April 16, 2009, Wright Medical submitted to the United States Department of Health & Human Services, Food and Drug Administration [FDA] a Section 501(k) premarket notification of intent to market a device generally identified as Profemur® hip system modular necks made of a cobalt chrome alloy.

85.     On August 25, 2009, Wright Medical received clearance from the FDA to distribute in the United States Profemur® modular necks manufactured from cobalt chrome.

86.     Sometime on or after August 25, 2009, Wright Medical began to offer with the Profemur® Hip System a modular neck component made of a cobalt chrome alloy for distribution in the United States.

87.     The Profemur® CoCr modular necks that Wright Medical designed and manufactured were designed to be used with most, if not all, of the same femoral heads and most, if not all, of the same Profemur hip stems as were its titanium Profemur® modular necks.

88.     In promoting its Profemur® CoCr modular necks Wright Medical has stated, "Product complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion or fractures for PROFEMUR® CoCr Modular Necks." [See Profemur® CoCr Modular Necks Frequently Asked Questions, Wright Medical publication MH619-812.]

89.     The claim by Wright Medical in promoting its Profemur® CoCr modular necks that, "Product complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion or fractures for PROFEMUR® CoCr Modular Necks," was not supported by unbiased sound scientific testing.

90.     The claim by Wright Medical that "Product complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion or fractures for PROFEMUR® CoCr Modular Necks" was false and misleading.

91.     In promoting its Profemur® CoCr modular necks Wright Medical claimed that these cobalt chrome modular necks would result in less fretting than occurred with titanium modular necks.

92.     Claims by Wright Medical that these cobalt chrome modular necks would result in less fretting than occurred with titanium modular necks was not supported by unbiased sound scientific testing.

93.     Claims by Wright Medical that its Profemur® CoCr modular necks would result in less fretting than occurred with titanium modular necks were false and misleading.

94.     The design of the Wright Medical Profemur CoCr modular neck, when coupled with the design of the Wright Medical titanium Profemur hip stems, is such that it in fact promotes the process of fretting corrosion at the modular neck/stem junction.

95.    In promoting its Profemur® CoCr modular necks Wright Medical claimed that the use of dissimilar metals, such as the mating of a CoCr modular neck with a titanium stem, would not result in galvanic corrosion ("battery effect") at a level that would be problematic for patients.

96.    Claims by Wright Medical that mating the mating of a CoCr modular neck with a titanium stem would not result in galvanic corrosion ("battery effect") at a level that would be problematic for patients, were not supported by unbiased sound scientific testing.

97.    Claims by Wright Medical that mating the mating of its Profemur CoCr modular necks with its Profemur titanium stems, would not result in galvanic corrosion ("battery effect") at a level that would be problematic for patients, were false and misleading.

98.    The design of the Wright Medical Profemur CoCr modular neck, when coupled with the design of the Wright Medical titanium Profemur hip stems is such that it in fact promotes the process of galvanic corrosion ("battery effect") at the modular neck/stem junction.

99.    Prior to offering its Profemur CoCr modular necks for distribution or sale in the United States, Wright Medical did not adequately test its design of CoCr Profemur modular necks for fretting corrosion after implantation in patients.

100.    Prior to offering its Profemur CoCr Modular Necks for distribution or sale in the United States, Wright Medical did not adequately test its design of CoCr Profemur modular necks for galvanic corrosion ("battery effect") after implantation in patients.

101. Prior to offering its Profemur CoCr modular necks for distribution or sale in the United States, Wright Medical did not adequately test its design of CoCr Profemur modular necks for galvanic corrosion ("battery effect") when mated with titanium Profemur hip stems after implantation.

102. Wright Medical rushed to market its Profemur CoCr Modular Necks without having adequately tested them for *in vivo* performance to resist fretting corrosion.

103. Wright Medical rushed to market its Profemur CoCr Modular Necks without having adequately tested them for *in vivo* performance to resist galvanic corrosion.

104. Wright Medical's rush to market was done to preserve market share and its profits from the sale of its Profemur hip products.

105. Wright Medical knew or should have known that as of the date of May 31, 2012, the date plaintiff received his Wright Medical CoCr and titanium modular neck:

a) It had not adequately tested its Profemur CoCr Modular Necks to simulate in vivo performance for resistance to fretting corrosion;

b) It had not adequately tested its Profemur CoCr Modular Necks to simulate in vivo performance for resistance to galvanic corrosion ("battery effect") its Profemur CoCr Modular Necks would be subject to fretting corrosion;

c) There was an increased risk of fretting corrosion at the neck stem junction; and,

d) There was an increased risk of galvanic corrosion ("battery effect") at the neck stem junction.

106. The neck stem junctions of the Profemur cobalt chrome modular neck, coupled with a Profemur titanium hip stem, are subject to significant micromovement which result in significant fretting corrosion, galvanic corrosion, and metal ion release.

107.   The neck stem junctions of the Profemur cobalt chrome modular neck, coupled with a Profemur titanium hip stem, and the micromovement which results in significant fretting corrosion, galvanic corrosion, and metal ion release, directly and proximately causes adverse medical conditions which lead to the failure and need for revision of the plaintiff's hip.

108.   Product complaint data reported to Wright prior to November 28, 2011 did indicate an increased risk of adverse events due to taper junction fretting and corrosion for Wright Medical Profemur CoCr modular necks when coupled with a Wright Medical Profemur hip stems, as compared to traditional titanium necks.

109.   Product complaint data reported to Wright prior to May 31, 2012 did indicate an increased risk of adverse events due to galvanic corrosion ("battery effect"), as compared to traditional titanium necks when coupled with a Wright Medical Profemur hip stems, as compared to traditional titanium necks.

110.   Based upon what Wright Medical knew or should have known as of May 31, 2012, a reasonable manufacturer would have ceased the distribution of the Wright Medical CoCr modular necks prior to that date

111.   Based upon what Wright Medical knew or should have known as of May 31, 2012, Wright Medical should have ceased the distribution of the Wright Medical CoCr modular neck prior to that date.

112.   Based upon what Wright Medical knew or should have known as of May 31, 2012, a reasonable manufacturer would have formally recalled the Wright Medical CoCr modular neck prior to that date.

113.   Based upon what Wright Medical knew or should have known as of May 31, 2012, Wright Medical should have formally recalled the Wright Medical CoCr modular neck, prior to that date.

114.   Based upon what Wright Medical knew or should have known as of May 31, 2012, prior to that date a reasonable manufacturer would have published information that its claims that product complaint data did not did indicate an increased risk of adverse events due to taper junction fretting and corrosion for Wright Medical Profemur CoCr modular necks when coupled with Wright Medical Profemur hip stems was false.

115.   Based upon what Wright Medical knew or should have known as of May 31, 2012, prior to that date Wright Medical should have published information that its claims that product complaint data did not did indicate an increased risk of adverse events due to taper junction fretting and corrosion for Wright Medical Profemur CoCr modular necks when coupled with Wright Medical Profemur hip stems was false.

116.   Based upon what Wright Medical knew or should have known as of May 31, 2012, prior to that date a reasonable manufacturer would have published information that its claims that product complaint data did not did indicate an increased risk of galvanic corrosion ("battery effect") for Wright Medical Profemur CoCr modular necks when coupled with Wright Medical Profemur hip stems was false.

117.   Based upon what Wright Medical knew or should have known as of May 31, 2012, prior to that date Wright Medical should have published information that its claims that product complaint data did not did indicate an increased risk of galvanic corrosion

("battery effect") for Wright Medical Profemur CoCr modular necks when coupled with Wright Medical Profemur hip stems was false.

118.    Based upon what Wright Medical knew or should have known as of May 31, 2012, prior to that date a reasonable manufacturer would have informed orthopedic surgeons using its Profemur hip products that its claims that product complaint data did not did indicate an increased risk of galvanic corrosion ("battery effect") for Wright Medical Profemur CoCr modular necks when coupled with Wright Medical Profemur hip stems was false.

119.    Based upon what Wright Medical knew or should have known as of May 31, 2012, prior to that date Wright Medical should have informed orthopedic surgeons using its Profemur hip products that its claims that product complaint data did not did indicate an increased risk of galvanic corrosion ("battery effect") for Wright Medical Profemur CoCr modular necks when coupled with Wright Medical Profemur hip stems was false.

120.    The neck stem junctions of the Profemur cobalt chrome modular neck, coupled with a Profemur titanium hip stem, are subject to significant micromovement which result in significant fretting corrosion, galvanic corrosion, and metal ion release.

121.    The neck stem junctions of the Profemur cobalt chrome modular neck, coupled with a Profemur titanium hip stem, and the micromovement which results in significant fretting corrosion, galvanic corrosion, and metal ion release, directly and proximately causes adverse medical conditions which lead to the failure and need for revision of the hip.

122.   Based upon the facts and allegations set forth above, the Wright Medical Profemur CoCr modular neck and Profemur hip stem system are defective in their design in that the risks that were inherent in this product being used for hip replacement, when weighed against the utility or benefit derived from the product, outweigh the benefit which might have gained by placing this defective product in the body of Plaintiff Herbert Tisher.

123.   Based upon the facts and allegations set forth above, the Wright Medical Profemur CoCr modular neck and Profemur hip stem system are defective in their manufacturing in that they do not comply with their intended design, specifications, in that the risks that were inherent in this product being used for hip replacement, when weighed against the utility or benefit derived from the product, outweigh the benefit which might have gained by placing this defective product in the body of Plaintiff Herbert Tisher.

124.   Based upon the facts and allegations set forth above, the Wright Medical Profemur CoCr modular neck and Profemur hip stem system are defective in their labeling in that they do not perform as represented, and the risks that were inherent in this product being used for hip replacement, when weighed against the utility or benefit derived from the product, outweigh the benefit which might have gained by placing this defective product in the body of Plaintiff Herbert Tisher.

125.   Based upon the facts and allegations set forth above, the Wright Medical Profemur CoCr modular neck are unreasonably dangerous in that the risks that were inherent in this product being used for hip replacement, when weighed against the utility or benefit derived from the product, outweigh the benefit which might have gained by placing this defective product in the body of Plaintiff Herbert Tisher.

126.   Defendants were negligent in their design, manufacture, distribution and sale, marketing, promotion, and labeling of the Wright Medical Profemur CoCr modular neck and Profemur hip stem system.

127.   Defendants were negligent in the failure to warn patients or surgeons that they had received product complaint data that did indicate an increased risk of adverse events due to taper junction fretting and corrosion, as compared to traditional titanium necks.

128.   Defendants were negligent in the failure to warn patients or surgeons that they had received product complaint data that did indicate an increased risk of adverse events due to galvanic corrosion ("battery effect"), as compared to traditional titanium necks.

129.   Defendants were negligent in their failure to cease distribution of the Wright Medical Profemur CoCr modular neck before the date of May 31, 2012.

130.   Defendants were negligent in their failure to recall the Wright Medical Profemur CoCr modular neck before the date of May 31, 2012.

## OPPRESSIVE, FRAUDULENT, MALICIOUS
## AND GROSSLY NEGLIGENT CONDUCT

131.   The failure of the Defendants to warn patients or surgeons that they had received product complaint data that did indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion is clear and convincing evidence of willful, oppressive, fraudulent, and malicious conduct, was grossly negligent, and demonstrates a conscious disregard for the safety of patients.

132.    The failure of the Defendants to cease the distribution of the Wright Medical Profemur CoCr modular neck before the date of May 31, 2012, is clear and convincing evidence of willful, oppressive, fraudulent, and malicious conduct, was grossly negligent, and demonstrates a conscious disregard for the safety of patients.

133.    The failure of the Defendants to recall the Wright Medical Profemur CoCr modular neck before the date of May 31, 2012, is clear and convincing evidence of willful, oppressive, fraudulent, and malicious conduct, was grossly negligent, and demonstrates a conscious disregard for the safety of patients.

## WARRANTIES

134.    Statements and representations made by the Wright Medical Defendants, as set forth in this Complaint, constitute express warranties as to the performance, durability, and capabilities of the Wright Medical cobalt chrome modular necks, and the Wright Medical artificial hip stems they were intended to be used with.  It is contended that any applicable express warranties are subsumed into the Product Liability Act, but to the extent that is not the case, they are here plead.

135.    By law certain implied warranties of merchantability and fitness for intended use are applicable to the Wright Medical CoCr Profemur modular necks, and the Wright Medical artificial hip stems they were intended to be used with.  It is contended that any applicable implied warranties are subsumed into the Product Liability Act, but to the extent that is not the case, they are here plead.

136.   The failure of the Plaintiff Herbert Tisher's Wright Medical CoCr Profemur modular neck coupled with the Plaintiff's Wright Medical hip stem was a breach of the applicable express warranties of the Wright Medical Defendants.

137.   The failure of the Plaintiff Herbert Tisher's Wright Medical CoCr modular neck coupled with the Plaintiff's Wright Medical hip stem was a breach of the applicable implied warranties of merchantability and fitness for intended use are applicable to this product.

## PLAINTIFF'S INJURIES AND DAMAGES

138.   On or about April 12, 2016, the Profemur® CoCr modular neck implanted in Plaintiff Herbert Tisher's right hip failed, meaning that due to corrosion of the oblong taper of the CoCr modular neck where it seated in the pocket of the Profemur® stem it was causing continuing and otherwise irreversible physical injury to the Plaintiff.

139.   On or about April 12, 2016, the Profemur® CoCr modular neck implanted in Plaintiff Herbert Tisher's right hip failed as a direct and proximate result of the actions, conduct, negligence, and breach of warranties of the Defendants, as alleged in this Complaint.

140.   As a direct and proximate result of the conduct of Defendants as set forth in this Complaint, plaintiff Herbert Tisher sustained injuries and damages including, but not limited to undergoing surgery to remove and replace his failed Wright Medical hip; past and future pain and anguish, both in mind and in body; permanent diminishment of his ability to participate in and enjoy the affairs of life; medical bills associated with the replacement procedure and recovery therefrom; future medical expenses; loss of

enjoyment of life; loss of past and future earnings and earning capacity; disfigurement; physical impairment, and other injuries not fully known at this time.

141.     Plaintiff Herbert Tisher's injuries suffered were both factually and proximately caused by the defective product of the Defendants.

142.     Plaintiff Herbert Tisher's injuries suffered were both factually and proximately caused by the unreasonably dangerous product of the Defendants.

143.     Plaintiff Herbert Tisher is entitled to recover for all economic and special damages incurred, including but not limited to damages for subsequent surgeries, rehabilitative services, follow up doctor visits and all expenditures incurred as a result of the additional operations and follow up procedures.

144.     Plaintiff Herbert Tisher is entitled to recovery for lost wages, having been disabled and diminished ability to earn income.

145.     Plaintiff Herbert Tisher is entitled to compensation for permanent disability as a result of the failure of this hip replacement device which caused substantial injury.

146.     Plaintiff Herbert Tisher further shows that he is entitled to recover for all noneconomic and compensatory damages allowed by law, including, but not limited to, pain and suffering for all pain and suffering that he has incurred as a result of the defective product, the follow-up surgery, rehabilitation, and constant pain that occurs as a result of the failure of the product.

## LIABILITY

### COUNT 1 – NEGLIGENCE

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in this Complaint.

147.   Defendants owed a duty of reasonable care to the general public, including the Plaintiff, when it designed, manufactured, assembled, inspected, tested, marketed, placed into the stream of commerce, and sold the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System, to assure that the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System were not defective and/or unreasonably dangerous for their intended purposes and foreseeable uses.

148.   Defendants breached this duty by designing, manufacturing, assembling, inspecting, testing, marketing, distributing and selling the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System in a defective and unreasonably unsafe condition including, but not limited to, its propensity for metal on metal failure.

149.   Likewise, Defendants owed Plaintiff a duty of reasonable care to discover the defect and to inform and/or warn Plaintiff of the defect once it was discovered, and Defendants failed to do so further placing Plaintiff at risk for harm and injury.

150.   Defendants were negligent in the particulars set forth in this Complaint, and such negligence was a direct and proximate cause of the incident and injuries set forth herein.

## COUNT 2 – STRICT PRODUCTS LIABILITY: DEFECTIVE DESIGN

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Complaint.

151.   The Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System used in Plaintiff's hip replacement surgery were not reasonably safe for the intended uses and were defective as described herein with respect to the design.  The Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System design defects cause significant amounts of metal ions to be released from the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System and into the blood stream.

## COUNT 3 – STRICT PRODUCTS LIABILITY – FAILURE TO WARN

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Complaint.

152.   The Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System were further rendered unreasonably dangerous because the Defendants failed to provide an adequate warning to consumers, operators and the public, including Plaintiff, regarding the hazards associated with the reasonable and foreseeable use of Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System.

153.   The Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System possessed defective and dangerous characteristics, as described herein, which caused damage, and the Defendants failed to use reasonable

30

care to provide an adequate warning of such characteristics and their dangers to health care providers and patients, including Plaintiff.

154.    At the time of the incident set forth herein, the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System were dangerous to an extent beyond that which would be contemplated by the ordinary health care provider and patient of the product, with the ordinary knowledge common to the medical community as to the products' characteristics.

155.    Health care providers and patients, including Plaintiff, did not know and should not have been expected to know of the dangerous characteristics of the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System, which had the potential to cause injury and damage.

156.    As a direct and proximate result of the Defendants' failure to warn, Plaintiff sustained serious injuries and was damaged.

## COUNT 4 – BREACH OF EXPRESS WARRANTY

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Complaint.

157.    Defendants warranted, both expressly and impliedly, through its marketing, advertising, distributors and sales representatives, that the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System were of merchantable quality, fit for the ordinary purposes and uses for which they were sold.

158.    The Defendants are aware that healthcare providers and patients, including the Plaintiff, rely upon the representations made by the Defendants when choosing,

Case 4:16-cv-00846-JLH   Document 1   Filed 11/17/16   Page 32 of 40

selecting and purchasing its products, including the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System.

159.    Due to the defective and unreasonably dangerous design and manufacture of the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System, it was neither of merchantable quality nor fit for the ordinary purposes for which it was sold, presenting an unreasonable risk of injury to patients, including Plaintiff, during foreseeable use.

160.    The defective and unreasonably dangerous condition of the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System constituted a breach of the Defendants' express and implied warranties, and such breach was a direct and proximate cause of the incident and injuries described herein.

## COUNT 5 – BREACH OF IMPLIED WARRANTIES

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Complaint.

161.    Defendants impliedly warranted that the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System were merchantable and were fit for the ordinary purposes for which they were intended.

162.    When the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System were implanted in Plaintiff to treat his damaged and worn hip joints, the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System were being used for the ordinary purposes for which they were intended.

32

163.    Plaintiff, individually and/or by and through the healthcare provider, relied upon Defendants' implied warranties of merchantability in consenting to have the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System implanted.

164.    Defendants breached these implied warranties of merchantability because the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System implanted in Plaintiff were neither merchantable nor suited for the intended uses as warranted.

165.    Defendants' breach of its implied warranties resulted in the implantation of an unreasonably dangerous and defective product in the body of Plaintiff, placing Plaintiff's health and safety in jeopardy.

166.    As a direct and proximate result of Defendants' breach of the aforementioned implied warranties, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## COUNT 6 – NEGLIGENT MISREPRESENTATION

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Complaint.

167.    Defendants had a duty to accurately and truthfully represent to the medical community, Plaintiff, and the public that Wright Medical Profemur CoCr modular neck,

33

and the Wright Medical Profemur Total Hip System, had not been adequately tested and found to be safe and effective for the treatment of damaged and worn parts of the hip joint.  Instead, the representations made by Defendants were false.

168.   Defendants negligently misrepresented to the medical community, Plaintiff, and the public the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System's high risk of unreasonable and dangerous adverse side effects.

169.   Had Defendants accurately and truthfully represented to the medical community, Plaintiff, and the public the material facts relating to the risks of the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System, Plaintiff and/or Plaintiff's healthcare provider would not have utilized Defendants' Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System for Plaintiff's treatment.

170. As a direct and proximate result of Defendants' negligent misrepresentation, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## COUNT 7 – MISREPRESENTATION BY OMISSION

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Complaint.

34

171.    Throughout the relevant time period, Defendants knew that its Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System were defective and unreasonably unsafe for their intended purpose.

172.    Defendants were under a duty to disclose to Plaintiff and the medical community the defective nature of the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System because Defendants were in a superior position to know the true quality, safety, and efficacy of the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System.

173.    Defendants fraudulently concealed from and/or failed to disclose to Plaintiff, Plaintiff's healthcare providers, and the medical community that its Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System were defective, unsafe, and unfit for the purposes intended, and that they were not of merchantable quality.

174.    The facts concealed and/or not disclosed to Plaintiff and the medical community were material facts that a reasonable person would have considered important in deciding whether to utilize Defendants' Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System.

175.    As a direct and proximate result of Defendants' fraudulent concealment, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but

not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## COUNT 8 – CONSTRUCTIVE FRAUD

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Complaint.

176.   Defendants were under a duty to disclose to Plaintiff and the healthcare providers the defective nature of the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System, including, but not limited to, the heightened risks of erosion, failure, and permanent injury.

177.   Defendants knew and/or had reason to know that the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System could and would cause severe personal injury to individuals implanted with these products.

178.   Defendants falsely and fraudulently represented to the medical community, Plaintiff, and the public that Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System were safe and effective, and were safer and more effective than other treatments for hip replacements.

179.   Defendants knew and/or had reason to know that those representations were false, yet Defendants willfully, wantonly, and recklessly disregarded the inaccuracies in its representations.

180.   Defendants made these false representations with the intent of defrauding and deceiving the medical community, Plaintiff, and the public, and to induce the medical community, Plaintiff, and the public to utilize its Wright Medical Profemur CoCr modular

neck, and the Wright Medical Profemur Total Hip System for treatment of damaged and worn hip joints and hip dysplasia. Doing so constituted a callous, reckless, willful, and depraved indifference to the health, safety, and welfare of Plaintiff and the public.

181.   Had Plaintiff or Plaintiff's healthcare providers known the true facts about the dangers and health risks of the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System, they would not have utilized said product.

182.   As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

### COUNT 9 – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Complaint.

183.   Defendants carelessly and negligently manufactured, designed, developed, tested, labeled, marketed, and sold the Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System to Plaintiff, carelessly and negligently concealed the harmful effects from Plaintiff, and carelessly and negligently misrepresented the quality, safety, and efficacy of the products.

184.   Plaintiff was directly impacted by Defendants' carelessness and negligence in that Plaintiff purchased the Wright Medical Profemur CoCr modular neck, and the

Wright Medical Profemur Total Hip System and has therefore sustained and will continue to sustain emotional distress, physical injuries, economic losses, and other damages.

185.   As a direct and proximate result of Defendants' fraudulent concealment, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## COUNT 10 – PUNITIVES

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Complaint.

186.   The acts and omissions of the Defendants as set forth herein constitute intentional, fraudulent, malicious and/or reckless conduct. Accordingly, Plaintiff is entitled to an award of punitive damages.

## DAMAGES

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Complaint.

187.   As a direct and proximate result of the acts and omissions of the Defendants alleged herein, Plaintiff was injured and damaged. The injuries and damages for which Plaintiff seeks compensation from the Defendants include, but are not limited to:

        a.      physical pain and suffering of a past, present and future nature;

        b.      emotional pain and suffering of a past, present and future nature;

c.      permanent impairment and scarring;

d.      medical bills and expenses of a past, present and future nature;

e.      loss of earnings;

f.      loss of earning capacity;

g.      loss of enjoyment of life;

h.      pre- and post-judgment interest;

i.      statutory and discretionary costs; and,

j.      all such further relief, both general and specific, to which they may be entitled to under the premises.

## PRAYERS FOR RELIEF

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Complaint.

WHEREFORE, PREMISES CONSIDERED, Plaintiff sues the Defendants for personal injuries and prays for a judgment against the Defendants for compensatory damages in an amount considered fair and reasonable by a jury, and for all such further relief, both general and specific, to which Plaintiff may be entitled under the premises.

WHEREFORE, PREMISES CONSIDERED, Plaintiff sues the Defendants for personal injuries and prays for a judgment against the Defendants for punitive damages in an amount considered fair and reasonable by a jury, and for all such further relief, both general and specific, to which they may be entitled under the premises.

**A JURY IS RESPECTFULLY DEMANDED.**

Respectfully submitted this 15th day of November 2016.

George E. McLaughlin
Colorado Bar 16364
Warshauer-McLaughlin Law Group, P.C.
1890 Gaylord Street
Denver, CO 80206-1211
Telephone: 720-420-9800
Facsimile: 303-322-3423
Email: GEM@w-mlawgroup.com
*Attorney for Plaintiff*